Chief Justice Robertson,
delivered the opinion of the court.
This is a suit in chancery by Arthur Conley’s heirs, to injoin a judgment in ejectment obtained against them by William Chiles. William Hays, who held a patent for eight hundred and twenty-four acres of land, sold one hundred and eighteen acres to William Bryant, undone hundred and eighteen acres to Arthur Conley, in 1793. Bryant settled on his one hundred and eighteen acres, in 1793, and afterwards sold fifty-nine acres to Taylor, and the other moiety to Hinton. Hinton sold his fifty-nine acres to Arthur Conley ; and Taylor having sold his fifty-nine acres to Bridges, the latter sold the same to the said Conley. A deed seems to have been made by Hays to Taylor in August, 1793, for the whole one hundred and eighteen acres. Taylor made a deed for the one hundred and eighteen acres to the plaintiffs, during the pendency *303 oí' this suit. They, and those under whom they claim, have been in the possession of this tract ever since 1793. ,
In 1794, Arthur Conley settled on the one hundred and eighteen acres, which he had bought from Hays. He held Hays’ covenant with Stephen Boyle as his surety for a general warranty title. He continued to reside on the land until his death in August, 1815, and the plaintiffs have retained the possession of it ever since. Hays, having in the mean time died, Conley sued Boyle and recovered judgment for damages, for a breach of his covenant, and the judgment having been affirmed by this court in 1810; (see II Bibb, 7.) Boyle paid the amount of it to .Conley. The record of the suit on the covenant is not incorporated in this record; but the plaintiffs and defendant both seem to have referred to it and considered it as an exhibit; and therefore, as it is on file in this court, wre will consider it as a part of the record, and notice it -accordingly. The satisfaction of the judgment we infer from the fact that this court affirmed it, and from the corroborating fact that one witness has positively sworn that Boyle paid it off; and that there is no opposing circumstance, inference or allegation.
Notwithstanding this satisfaction, and virtual rescisión .of the- contract with Hays, Conley retained the possession of the land, intending to hold it under cover of a patent to Thomas Miller for two thousand acres including it. It does not appear however, that he had derived any right whatever from Miller, (who was a nonresident,) or that he had ever notified the heirs of Hays (some of whom were minors, and all of whom were as we infer, nonresidents,) that intended to hold under Miller.
Chiles, having purchased" from the heirs of Hoys their right to the eight hundred and twenty four acres, and to another adjoining tract, also granted to. their ancestor, obtained a judgment in ejectment in 1818, against Conley’s heirs and others, which judgment, this court affirmed; see II Marshal], 212. To injoin this judgment, this suit was instituted by Conley’s hei rs. They allege that in 181)1, nine hundred and forty-nine acres of Miller’s two thousand acres, were sold by the register for taxes due to the Slate, and that John U-Waring, who had acquired the legal title thereto, from. *304 the register, had sold it to them in 1815; that Miller’s patent is posterior in date to that of Hays, but that his entry is older and better. They disclaim holding urn der Hays, but in an amended bill, aver that they had ascertained since the trial in ejectment, that Hays had conveyed the legal title to both Taylor and Arthur Con.ley, and exhibit the deeds which had been recorded in the county of Clarke, in which the two one hundred and eighteen acre tracts lay. They make Taylor, Hinton, Bryant, and the heirs of Bridges, defendants, together with Chiles and the heirs of Hays.
The expression ‘••abnut two miles,” when used in an entry, means or imports exactly "two miles.
None of them answered the bill, except Chiles and the heirs of Bridges. Chiles denies the material ■allegations of the bill, and insists that the plaintiffs shewed no equity. The heirs of Bridges allege, that ■the contract between their ancestor and Arthur Conley had been rescinded.
On the final hearing, the circuit court discharged the injunction, and dismissed the bill.
Preliminary, to a consideration of other and more ' essential points, we will ascertain whether or not the entry of Miller is valid.
It was made on the loth of March, 1783; and is as follows: “Thomas Miller enters two thousand acres of land on a T. W. numbered 9,530, beginning on the creek about two miles below Estill’s battle ground, on the place that Captain Estill was killed, running west five hundred and sixty-six poles; thence running north to include the quantity at right angles, exclu-. sive of all prior claims, and lands unfit for cultivation.”
The survey begins on the creek rather more than two miles on a straight line from the spot where, according to,the proof, Captain Estill fell. But if the beginning be fixed at-the- precise distance of two miles, we have no doubt that the survey will include the land in contest, or most of it. “About” two miles, must be considered as importing, according to estabr fished consfruction, exactly two miles. The call to exclude “prior claims and lands unfit for cultivation,” cannot affect the validity of the entry, as the survey Was made so as to include only two thousand acres; because a subsequent locator, seeing that it must include that quantity at least, would have no right to suppose that the two thousand acres actually included *305 in it, bad not been appropriated; Craig and Mosby vs. Cogar, Hardin, 381; and Carland vs. the same, I Bibb, 84.
We are of opinion that the identity and notoriety of Estill’s battle ground are sufficiently established.
The annexed diagram will aid in the application of the facts.
The battle was fought on the 22d of March, 1782, in the now county of Montgomery, and in the vicinity of Mountsterling. It is a memorable incident, and perhaps one of the most memorable, in the interesting history of the settlement of Kentucky. The usefulness and popularity of Captain Estill; the deep and universal sensibility excited by the premature death of a citizenso gallant andso beloved; the emphatic character of his associates in battle; the masterly skill and shivalric daring displayed throughout the action, (“every man to his man, and each to his tree;”) the grief and despondence produced by the catastrophe; all contributed to give to “ESTILL’S DEFEAT,” a most signal notoriety and importance, especially among “the early settlers.” All the story with all its circumstances of locality, and of “the fight,” was told and told again -and again, until even the children knew it “by heart” No legendary tale was ever listened to with as intense anxiety, or was inscribed in-as vivid and indelible an impress, on the hearts of the few of both sexes who then constituted the hope and strength of Kentucky.
Such is the traditional as well as the recorded history of this sanguinary battle between the white men and the Indians; and such too, is the testimony embodied in this cause.
It could scarcely be credited, that the scite of such a rencounter could not have been found by any rational man, exercising the usual and ordinary diligence.
But the testimony in this ease proves satisfactorily that not only the scile of the battle, but even the spot where the intrepid leader of the little spartan band fell, might, in 1783, have been found without any difficulty. The dead were buried, or rather covered with logs, by persons from several “stations;” and in fact from all the stations as near the scene as Boonsborough.
in an entry made in !83 a call for “Ks-till’s battle ground” or for the place “where Capl. Estill was killed,” is sufficiently notorious and descriptive.
Á trace led from Boonsborough to Caulk’s cabin and spring, near the creek, and about three miles above where the battle was fought. This cabin was the only one within several miles of the battle ground, and could have been easily found. There was a small improvement, a short distance above the battle ground, and on the opposite side of the creek. The battle was fought on and near the maid creek, principally between two tributary branches, a. a. the lowest of which empties itself into the creek in a singular manner. “little mountain” is only about two miles above. Estill fell-al A; McNealy at B; John South at C; John Colefoot at D: Jonathan McMillan atE. A gun has been found at F. David Cooke, who survived, was shot down at G. These spots have been designated, and these facts proved by the concurrent testimony of sovexal of the surviving combatants, and others who have been sworn in this case. It was also proved that the bones of some of the dead, and the scars made on the trees by the bullets, and other vestiges remained visible, for several years, to identify and define the theatre of this memorable battle; a circle with a diameter of two hundred yards would have enclosed it. The two branches arc not more than two hundred yards apart.
These facts, and the many strong deductions which might be made from them will not allow us to doubt that the call for “Estill’s battle ground,” and even for the place “where Captain Estill was killed,” is suffiw ciently descriptive and locative.
It would have been difficult in ’83, to have made a more-special call, or one more easy to be understood .and established; and considering the then condition ■ of the country, as we should do, wc should make an ■ unreasonable requisition, if we should require a -better call than the leading call in Miller’s entry. Neither the centre nor the circumference of the battle ground (coaid be described with geometrical precision; but the ground on which the battle was fought might ha've been easily ascertained; and therefore, if by measuring two miles from any part of it, the survey will b> ¿lude, as we are sure it would, the land in contest, or a part of it, the entry so far, would be good.
In general, a person who tenant ^ quasi tenant under another’^ 1S¡nSe°uitv as well as at3 law, to deny und°r tered, or to insist on being proteotedm itPPby\a°king refuge under iU)y adversary claim,
As to the one hundred and eighteen acres bought from Hays by Conley, the plaintiffs are not entitled to any decree, unless they can obtain it on Miller’s entry, because Conley rescinded his contract with Hays, by pursuing a legal remedy for damages for a failure to convey the legal title to him.
If the plaintiffs have any equity which would be available under any circumstances, vre suppose that it might be so in this case. As a general principle, it is undeniable that a person, who had entered as tenant or quasi tenant under another, will be thereby estopped, in equity as well as at law, to deny the title under which he entered or insist on being protected in opposition to it, by taking refuge under any adversary claim; and therefore, the ini unction was improvidently granted in this case, because having tailed at law, it was the duty of the plaintiffs to surrender the possession, unless, as holders of a mere equily derived from Hays, they had a right, in equity, to resist the enforcement of the judgment, or, on some other ground, had a right to a decree for a new trial. ' ■
The claim derived through Taylor does not entitle them, quoad hoc, to either an injunction or a new trial. Waiving other objections which might be made to any such relief, the fact that the legal title seems to have passed from Hays to Taylor, in 1793, is sufficient. By relying on that fact, the plaintiffs might, if the deed .be valid and effective, (and in this case it seems to be so,) have succeeded in the action of ejectment, either b;y showing that the legal title was not in the defendant, or had been barred by lapse of time, unless some saving disabilities suspended the operation of the statute of limitations. No sufficient reason has been shown or suggested for not making such defence at law. Therefore, as to that matter, there is no ground for decreeing a new trial. And, as the defence was legal, and the legal title seems, prima facie, to have been in the plaintiffs before the decree was rendered, no good reason remained for a perpetuation of the injunction to the judgment.
As to the fifty-nine acres sold to Conley by Taylor, there can be no doubt that the plaintiffs might have relied on the deed to Taylor, in bar of the right of entpy claimed by the defendant ; and as to the fifty-nine *308 acres alleged'to have been bought from Hinton, there can be as little doubt that the plaintiffs were not estop» pedto rely on Taylor’s deed, because, by making that deed, Hays divested himself of the title, and thereby absolved Conley from his obligations of allegiance as a quasi7tenant under his title.
It was right, therefore, to dismiss the bill, as to the claim derived through Taylor, so far as the defendant might be affected by it. The plaintiffs should resort to their legal remedy for enforcing that claim. But they were entitled to a decree against Hinton for a release of any equity which he may hold; and therefore, the dismission as to him, was erroneous.
But so much of the claim as may have been derived from Miller,stands on a different ground; admitting that the circuit court erred in granting the injunction, it does not follow, as a necessary consequence, that the plaintiffs were not entitled to a decree on the final hearing. If ihey owned a superior adversary equity, there could be no doubt, that, although they could not rely upon it for resisting the judgment, they might enforce it against the defendant after submitting tu the judgment and restoring the possession. The injunction had been dissolved, and it does not appear whether the judgment had been enforced or not. If it had not been, it mi ght have been either by entry or process; and the error of the court in directing a temporary suspension of the judgment is not a conclusive objection to the relief sought on Miller’s entry, if, without such suspension, the plaintiffs be entitled to a decree on the merits.
But it is not necessary or perhaps even proper to decide on the right of the plaintiffs to a decree on Miller’s entry. The proper parties were not before the court. Before it could be ascertained whether or not the plaintiffs acquired an available equity in Miller’s claim, it would be necessary to make John U. Waring a party. He is not a party. Therefore, we shall not now decide whether Miller’s title passed by the register’s deed, nor whether the limitation to a suit on his entry, commenced when possession was first taken under Hays, or only when Hays’ patent issued. As to the claim under Miller’s entry, the bill might have been dismissed without prejudice. But as the proper parties. *309 had not been made, the circuit court erred as to Miller’s entry, in dismissing the bill absolutely.
Triplett, for plaintiffs; Mills and Brown, for defendants.
Wherefore, the decree dismissing the bill, as against the defendant, so far as it sought reiief on the alleged equity derived from Hays, is approved. But, so far as it withheld the relief sought against Hinton, and dismissed the bill absolutely, as to the claim under Miller’s entry, it is reversed, and the cause is remanded, with instructions to render a decree against Hinton, to the extent of his equity; and either to dismiss 'the bill, as to Miller’s entry, without prejudice, or to allow time to make the proper parties, as the circuit court shall, in the exercise of a sound discretion, deem most just and equitable.